J-S77015-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN  RE: M.C.G. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.D., MOTHER | No. 775 EDA 2013 |

Appeal from the Decree entered February 12, 2013,
in the Court of Common Pleas of Philadelphia County, Family
Court, at No: CP-51-AP-0000060-2013

BEFORE:    STABILE, JENKINS, and STRASSBURGER*, JJ.

MEMORANDUM BY STABILE, J.:                **FILED FEBRUARY 09, 2015**

C.D. (Mother) appeals from the decree entered February 12, 2013, in the Court of Common Pleas of Philadelphia County, which involuntarily terminated Mother's parental rights to her minor daughter, M.C.G. (Child), born in July of 2008.[1]  We affirm.

The trial court summarized the relevant factual and procedural history of this matter as follows.

> On June 19, 2010, the police were called to [Mother's] residence after she struck . . . [Child] with a shoe and threatened to kill her.  [Mother] left the home before the police arrived, and [Child] was moved to the home of a maternal aunt [(Aunt)].  [Child] was two years old at the time.
>
> On June 20, 2010, Mother visited [Child] at the home of [Aunt].  When [Aunt] fell asleep, Mother attempted to hang

---

\* Retired Senior Judge assigned to Superior Court.

[1] The court entered a separate decree that same day, which involuntarily terminated the parental rights of Child's putative father, A.G. (Father). Father did not appear at the termination hearing, and is not a party to the instant appeal.

[Child] with a bed sheet. Thankfully, a cousin intervened and called the police; however, Mother fled before the police arrived.

[The Philadelphia Department of Human Services (DHS)] obtained an Order of Protective Custody for [Child] on June 21, 2010, and the [C]hild was placed in the home of [Aunt]. On this same date, DHS learned that Mother had contacted the police and reported that her mother had drugs and weapons in her possession. The police arrived and transported Mother to Episcopal Hospital for mental health treatment.

On June 22, 2010, DHS learned that Mother threatened to kill [Aunt] and [Child] when she was released. Mother also warned that if the [C]hild was moved to her mother's home, she would kill [Child] and set her mother's house on fire.

On June 23, 2010, a shelter care hearing was held, at which time the Order of Protective Custody was lifted, the temporary commitment to DHS was ordered to stand, physical custody was awarded to [Aunt], and a Stay-Away Order was issued against Mother. [Child] was adjudicated dependent and committed to DHS on June 29, 2010, and Mother was granted visitation upon her physician's authorization.

Mother's Family Service Plan (FSP) Objectives throughout the pendency of this case have been: 1) to provide all requested information and authorization; 2) to stabilize her mental health; 3) to meet with her psychiatrist, comply with the treatment recommendations and take her medication consistently; 4) to improve the parent-child relationship; 5) to maintain visitation; [6]) to meet with the agency worker and work toward her individual service plan objectives; [7]) to meet with the provider social worker to understand how her behavior resulted in injury to [Child]; [8]) to complete a parenting capacity evaluation; and [9]) to learn and use non-physical methods of discipline.

Trial Court Opinion, 4/3/13, at 2-4 (citations to the record omitted).

On January 25, 2013, DHS filed a petition to involuntarily terminate the parental rights of Mother. A termination hearing was held on February 12, 2013, during which the court heard the testimony of DHS social worker

- 2 -

Jennie Cummons, psychologist Dr. William Russell, social worker Nickie Davis, and Mother. Following the hearing, the court entered its decree terminating Mother's parental rights. Mother timely filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Mother now raises the following issues for our review.

1. Did Petitioner, DHS, fail to establish by clear and convincing evidence that the [M]other's parental [rights] should be terminated when the [M]other had completed or begun her Family Service Plan[](FSP) objectives and had never evidenced a settled purpose of relinquishing claim to her [C]hild nor had refused or failed to perform parental duties[?]

2. Did the trial judge err in terminating the [M]other's parental rights when he either ignored or rejected the recommendations of the petitioner's expert witness who had detailed the plan for the [M]other to follow in order to remedy the conditions which brought the [C]hild into placement[?]

3. Did the judge err in terminating the [M]other's parental rights when there was no clear adoptive resource for the [C]hild at the time of the hearing[?]

Mother's Brief at 4 (trial court answers omitted).

We consider Mother's claims, mindful of our well-settled standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial

court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Mother's parental rights pursuant to Section 2511(a)(1), (2), (5), (8) and (b).[2] We need only agree with the trial court as to any one subsection of Sections 2511(a), as well as

---

[2] Both Mother and the trial court indicate that Mother's parental rights were terminated pursuant to Section 2511(a)(1), (2), (5), and (b) only. Mother's Brief at 8; Trial Court Opinion, 4/3/13, at 8. However, the court's termination decree reveals that Mother's rights were terminated under Section 2511(a)(8) as well.

- 4 -

Section 2511(b), in order to affirm. ***In re B.L.W.***, 843 A.2d 380, 384 (Pa.

Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here,

we analyze the court's decision to terminate under Sections 2511(a)(2) and

(b), which provide as follows.

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> \* \* \*
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> \* \* \*
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by

terminating Mother's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Instantly, the trial court concluded that Mother's parental rights should be terminated in light of, *inter alia*, her anger and mental health issues. Trial Court Opinion, 4/3/13, at 9. The court reasoned that "it is unlikely that additional time will allow Mother to remedy these conditions as Mother has consistently demonstrated her unwillingness to progress." *Id.* at 12.

In response, Mother presents several closely-related arguments. First, Mother contends that her parental rights should not have been terminated because she was making "significant progress" toward achieving her FSP objectives, and because her anger management issues are not as serious as the trial court suggests. Mother's Brief at 8-10. Mother's next argument is that the trial court erred by terminating Mother's parental rights without giving her sufficient time to complete the recommendations presented in a

- 6 -

parenting capacity evaluation authored by Dr. William Russell. *Id.* at 11-12. Mother states that the court "either ignored or rejected the recommendations and didn't allow [Mother] the opportunity to fulfill them." *Id.* at 12. Finally, Mother claims that Child has behavioral problems, that Child's preadoptive foster parents will likely decide not to adopt her, and that Child would be better off if Mother were given more time to achieve reunification. *Id.* at 13-14. In connection with this argument, Mother states that Aunt accompanied her to the termination hearing and stood next to her. *Id.* at 15. Mother asserts, through a series of rhetorical questions, that this action shows that Aunt was lying when she alleged that Mother had committed the acts resulting in Child's placement, and that the trial court abused its discretion by not finding Mother credible. *Id.* at 14-15.

After a thorough review of the record in this matter, we conclude that the trial court did not abuse its discretion by involuntarily terminating Mother's parental rights pursuant to Section 2511(a)(2). During Mother's termination hearing, DHS social worker Jennie Cummons testified that Child has been in care since June of 2010, as a result of incidents during which "Mother threatened to kill [Child], was seen trying to strangle [Child], and tried to sell her for a hundred dollars." N.T., 2/12/13, at 30-31. Ms. Cummons acknowledged that, since that time, Mother had completed, or at least participated in, most of her FSP objectives. *Id.* at 45. For example, Mother completed a parenting class and an anger management class. *Id.* at

33-34. However, Mother refused to admit that she had threatened, or attempted to harm, Child, and Mother had missed several of her visits with Child. *Id.* Mother also remained unemployed and resided with her grandmother. *Id.* at 41.

Ms. Cummons further testified that Mother had been "inconsistent" with respect to her mental health treatment. *Id.* at 32. Specifically, Mother was attending treatment "[w]eekly to biweekly" rather than twice per week as recommended. *Id.* at 33. Additionally, Mother had not seen a psychiatrist for medication management since the previous September. *Id.* Ms. Cummons opined that Mother was unable to provide for Child, "[d]ue to Mother being inconsistent with her own mental health and still continuing to show ang[ry] outbursts and not admitting to being -- or working through the abuse allegations." *Id.* at 49.

Ms. Cummons explained that Mother has a history of engaging in threatening and erratic behavior. She recounted one incident that took place at a hearing on August 2, 2012, during which "Mother became very angry and when the Master was questioning her, she stated that she didn't have time to take her medication that day because everyone was f'n rushing her." *Id.* at 34. Additionally, Mother threatened Ms. Cummons, and "was threatening our counsel at DHS saying that she was going to f'n hurt him." *Id.* On December 27, 2012, Mother "was seen . . . threatening staff, other DHS workers and clients" at the DHS office. *Id.* at 36, 40. Mother "was

verbally abusive and threatening the staff [s]ecurity and other clients and she repeatedly stated that she would hit anyone that walked by and threatened violence to an agency worker who simply asked that she not use such language with children around." ***Id.*** at 36. This incident took place on the same day that Mother completed her anger management class. ***Id.*** at 40.

Social worker Nickie Davis testified that Mother missed approximately one visit with Child per month, for a total of four or five missed visits. ***Id.*** at 51, 58. Ms. Davis noted that Mother does not become angry or impatient with Child during visits. ***Id.*** at 59. She did, however, recount an incident during which Child was not brought to a visit, and Mother responded by slamming a glass door and using profanity. ***Id.*** at 53.

Dr. William Russell testified at the termination hearing as an expert in forensic psychology, with a specific expertise in parenting and custody. ***Id.*** at 7. Dr. Russell stated that he authored a parenting capacity evaluation with regard to Mother in September of 2012. ***Id.*** at 8-9. He explained that he conducted the evaluation by reviewing all available information about Mother and by subjecting Mother to a personality test. In addition, he and one of his interns interviewed Mother. ***Id.*** at 10.

During the evaluation, Mother admitted that she sold crack cocaine during the time she was pregnant with Child, and she reported that she had no employment history other than "a short two-month period." ***Id.*** at 14,

16. Mother denied that she had abused Child, and blamed Aunt for Child's placement with DHS. *Id.* at 12, 21, 28. Mother also reported a lengthy mental health history, resulting in difficulties getting along with people, frequent mood swings, and "outbursts of control." *Id.* at 13, 16. Mother stated that she has been diagnosed with "bipolar disorder, depression, attention deficit, hyperactivity disorder and schizophrenia." *Id.* at 22. Mother described herself as experiencing a variety of mental health issues, including "sleeping problems, eating problems, memory problems, sadness, hypervigilance, racing thoughts, more talkative than usual, depleted self-esteem, problems concentrating, lack of motivation, feelings of hopelessness, nervousness, anxiety, excessive worry, excessive energy, increased inactivity and impulsivity . . . ." *Id.* at 23-24. However, Mother believed that she could control her anger, and that she did not need anger management classes. *Id.* at 14, 16, 24-25. Mother stated that she sometimes had difficulty telling the difference between a dream and real life. *Id.* at 16-17, 24. She reported having thoughts of hurting herself, and she "admitt[ed] to cutting herself in the past, most recently six months prior to" the interview with Dr. Russell. *Id.* at 23.

Ultimately, Dr. Russell concluded that Mother was not capable of providing Child with safety and permanency. *Id.* at 17. Dr. Russell explained that this conclusion was based on "inconsistency" in Mother's lifestyle, housing, and employment. *Id.* Dr. Russell also emphasized

Mother's inconsistent visitation with Child, and Mother's "lack of any consistent, stable, supportive relationships." *Id.* Dr. Russell recommended that Mother obtain "consistent psychotherapy . . . and consistent psychiatric monitoring with medication," followed by stable housing and employment, as well as anger management classes and classes to improve her parenting skills. *Id.* at 19, 26-27; DHS Exhibit 5 at 6-7.

Mother testified that she missed Child and wanted her back. N.T., 2/12/13, at 63. Mother denied that she ever hit Child or tried to strangle her, and claimed that Aunt lied about Mother's behavior. *Id.* at 62, 71. Mother stated that she completed a parenting program, a housing and financial workshop, and an anger management workshop. *Id.* at 65; Mother's Exhibit 1-3. She also testified that she was attending therapy regularly. N.T., 2/12/13, at 66; Mother's Exhibit 4. Mother claimed that she was willing to complete the recommendations contained in Dr. Russell's report. N.T., 2/12/13, at 67-68.

Mother admitted that she swore during the August 2, 2012 hearing, but claimed that she only swore at the Master, and no one else. *Id.* at 60. She also admitted to slamming a door when Child was not brought to a visit. *Id.* at 61. Mother denied that she ever threatened Ms. Cummons. *Id.* Mother claimed that she was not on her medication during some of her prior outbursts, that she had been consistent with her medication since these

- 11 -

outbursts, and that she would take additional medication as required. **Id.** at 68-69.

In sum, our review of the record supports the trial court's conclusion that Mother is incapable of parenting Child, and that her parental incapacity has left Child without essential parental care or control. It was also reasonable for the court to conclude that Mother will not, or cannot, remedy this incapacity. The record establishes that Mother's mental health issues have caused her to act violently and irrationally, and that Mother poses a grave risk of harm to Child. While Mother attends therapy and has completed an anger management class, her mental health issues have persisted, as evidenced by the incident that took place at the DHS office in December of 2012. While Mother denied that she attempted to harm Child, and blamed Aunt for Child's placement with DHS, the trial court rejected Mother's testimony. The court's credibility determination is supported by the record, and we are required to accept it. **See T.S.M.**, 71 A.3d at 267.

Further, we reject Mother's argument that the trial court failed to give her sufficient time to follow the recommendations of Dr. Russell. At the time of the termination hearing, Child had been in placement for over two and one-half years, and we agree with the court that Mother has had ample opportunity to improve her mental health and to make herself a suitable parent. Finally, Mother's claim that Child's preadoptive foster parents will

ultimately refuse to adopt her is mere speculation, and does not warrant reversal of the trial court's order.

Next, we consider whether termination was proper under Section 2511(b). The requisite analysis is as follows.

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (some citations omitted).

With respect to the bond analysis pursuant to Section 2511(b), our Supreme Court has explained, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *T.S.M.*, 71 A.3d at 267. "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *Id.* at 268 (citation omitted). Moreover, in weighing the bond considerations pursuant to section 2511(b), "courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years,

and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Here, the trial court concluded that termination would be in Child's best interest because there was no evidence of a parental bond between Mother and Child. Trial Court Opinion, 4/3/13, at 13. In contrast, Mother argues that she was doing well in her visits with Child, and that the quality of these visits demonstrated that such a bond exists. Mother's Brief at 10.

Again, we conclude that the record supports the trial court's decision to terminate Mother's parental rights pursuant to Section 2511(b). Ms. Cummons testified that Child has resided with a preadoptive foster family since July of 2012. N.T., 2/12/13, at 36-37. Child refers to her foster parents as "Mom and Dad." *Id.* at 37. Child is "very comfortable" in her foster parents' home, and she is "very bonded with the family." *Id.* at 37-38. Ms. Cummons noted that Child had shown improvement while in the care of the foster family, in that she is "[b]eing more socially acceptable to others, calmer, less outbursts, affectionate." *Id.* at 47. She opined that Child would not suffer irreparable harm if Mother's parental rights were terminated. *Id.* at 38.

Ms. Davis agreed that Child is "happy" in the care of her foster parents, and that she would not suffer irreparable harm if Mother's parental rights were terminated. *Id.* at 54-55. Concerning visits between Mother

and Child, Ms. Davis testified that these visits go "pretty well." *Id.* at 50. During a typical visit, Mother brings a snack for Child, as well as "beads to make bracelets." *Id.* Mother and Child also watch a movie. *Id.* Ms. Davis explained that Child does not have a hard time leaving Mother after visits, nor does she ask about Mother. *Id.* at 52. During rides back to her foster home, Child does not talk about her foster family either, but Child does ask if she can visit with Aunt. *Id.* at 51.

Thus, the testimony presented during Mother's termination hearing confirms that it would be in Child's best interest if Mother's parental rights were terminated. We agree with the trial court that there was little, if any, evidence presented to suggest that Mother and Child are bonded. Instead, Child is bonded with her foster parents. Child refers to her foster parents as "Mom and Dad," and Child has improved while in their care. Removing Child from this environment would clearly be detrimental to Child's well-being. This is especially true where, as here, Mother's ability to care for Child is questionable at best.

Accordingly, because we conclude that the trial court did not abuse its discretion by involuntarily terminating Mother's parental rights pursuant to Section 2511(a)(2) and (b), we affirm the decree of the trial court.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/9/2015